[ARGUMENT NOT YET SCHEDULED]

**No. 15-5051**

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS,

*Appellant,*

*v.*

UNITED STATES DEPARTMENT OF JUSTICE EXECUTIVE OFFICE FOR UNITED STATES
ATTORNEYS; and UNITED STATES DEPARTMENT OF JUSTICE,

*Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA (NO. 14-269 (CKK))

---

**OPENING BRIEF OF APPELLANT**

---

KERRI L. RUTTENBERG
 *Lead Counsel*
YAAKOV M. ROTH
JULIA FONG SHEKETOFF*
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC  20001
(202) 879-3939

*Counsel for Appellant*

*Admitted in New York
Supervised by member of D.C. bar

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Counsel for Appellant certifies as follows:

1.      Parties and *Amici*

The plaintiff in the District Court, and the appellant in this Court, is the National Association of Criminal Defense Lawyers.  The defendants in the District Court, and the appellees in this Court, are the Executive Office for United States Attorneys and the United States Department of Justice.  No *amici* have yet entered an appearance in this Court.  No *amici* entered appearances below.

2.      Ruling Under Review

This is an appeal of a final order of the Honorable Colleen Kollar-Kotelly entered on December 18, 2014, granting Defendants-Appellees' motion for summary judgment and denying Plaintiff-Appellant's cross-motion for summary judgment.  JA 108 (order); JA 109-122 (memorandum opinion).  The District Court's opinion is available at 2014 WL 7205392.

3.      Related Cases

This case was not previously before this Court or any other court, and there are no related cases within the meaning of Circuit Rule 28(a)(1)(C).

## TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .............i

TABLE OF AUTHORITIES ...................................................................iv

GLOSSARY...........................................................................................ix

STATEMENT OF JURISDICTION...........................................................1

STATEMENT OF THE ISSUES................................................................1

STATEMENT OF PERTINENT AUTHORITIES ......................................2

STATEMENT OF THE CASE..................................................................2

    A.    DOJ Created The Blue Book To Stem Systemic
Discovery Abuses, And So Advised Congress.........................2

    B.    DOJ Has Refused To Make Public The Blue Book's
Contents ...............................................................................4

    C.    The District Court Allowed DOJ To Keep Secret The
Contents Of The Blue Book...................................................5

SUMMARY OF ARGUMENT .................................................................7

STANDARD OF REVIEW ......................................................................9

ARGUMENT .......................................................................................10

    I.    THE BLUE BOOK MAY NOT BE CATEGORICALLY
WITHHELD UNDER EXEMPTION 5 BECAUSE IT IS NOT
WORK PRODUCT ........................................................................10

        A.    The Work-Product Privilege Shields Only Strategic,
Adversarial Documents That Address A Specific Claim
Or Transaction, Not Policy Guidelines Created In The
Ordinary Course Of Business ................................................11

        B.    Under These Principles, The Blue Book Is Not Work
Product, And The District Court Erred By Concluding
Otherwise ............................................................................23

        C.    Adding Work Product To An Otherwise Unprivileged
Document Does Not Somehow Cloak The Entire
Document In Privilege .........................................................32

II.     FOR TWO INDEPENDENT REASONS, EXEMPTION 7(E)
        IS ALSO INAPPLICABLE TO THE BLUE BOOK ........................37

        A.    Exemption 7(E) Is Inapplicable Because The Blue Book
              Was Not Created For Law Enforcement Purposes .................38

        B.    Exemption 7(E) Is Also Inapplicable Because Producing
              The Blue Book Could Not Conceivably Risk
              Circumvention Of The Law ....................................................41

        C.    If Any Part Of The Blue Book Is Subject To Exemption
              7(E), At Minimum The Remainder Must Be Segregated
              And Produced ........................................................................48

CONCLUSION ...................................................................................................49

CERTIFICATE OF COMPLIANCE ....................................................................51

CERTIFICATE OF SERVICE .............................................................................52

STATUTORY ADDENDUM ...............................................................................53

        5 U.S.C. § 532 ...........................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allard K. Lowenstein Int'l Human Rights Project v. Dep't of Homeland Sec.*,
   626 F.3d 678 (2d Cir. 2010) .......................................................................45, 46

*\*Am. Immigration Council v. U.S. Dep't of Homeland Sec.*,
   905 F. Supp. 2d 206 (D.D.C. 2012)..................................... 13, 18, 20, 26, 27, 29

*Blackwell v. Federal Bureau of Investigation*,
   646 F.3d 37 (D.C. Cir. 2011) .............................................................................45

*Bristol-Meyers Co. v. FTC*,
   598 F.2d 18 (D.C. Cir. 1978).............................................................................12

*Burka v. U.S. Dep't of Health & Human Servs.*,
   87 F.3d 508 (D.C. Cir. 1996)......................................................................10, 21

*\*Citizens for Responsibility and Ethics in Wash. v. U.S. Dep't of
   Justice*,
   746 F.3d 1082 (D.C. Cir. 2014) ..................................................................41, 45

*\*Coastal States Gas Corp. v. Dep't of Energy*,
   617 F.2d 854 (D.C. Cir. 1980).................... 12, 13, 15, 16, 18, 23, 24, 26, 27, 31

*Ctr. for Auto Safety v. EPA*,
   731 F.2d 16 (D.C. Cir. 1984)..............................................................................33

*Cuneo v. Schlesinger*,
   484 F.2d 1086 (D.C. Cir. 1973).........................................................................49

*\*Delaney, Migdail & Young, Chartered v. I.R.S.*,
   826 F.2d 124 (D.C. Cir. 1987)........................... 17, 18, 19, 20, 24, 26, 27, 29, 30

*Dep't of Air Force v. Rose*,
   425 U.S. 352 (1976)......................................................................................21, 31

\*  Authorities upon which we chiefly rely are marked with asterisks.

*Doherty v. U.S. Dep't of Justice*,
   775 F.2d 49 (2d Cir. 1985) ..............................................................47

*EPA v. Mink*,
   410 U.S. 73 (1973).........................................................................12

*Etelson v. Office of Pers. Mgmt.*,
   684 F.2d 918 (D.C. Cir. 1982)........................................................38

*Hayden v. Nat'l Sec. Agency*,
   608 F.2d 1381 (D.C. Cir. 1979).................................................22, 31

*In re Sealed Case*,
   146 F.3d 881 (D.C. Cir. 1998).................................16, 18, 21, 24, 25

*Jefferson v. U.S. Dep't of Justice, Office of Prof. Responsibility*,
   284 F.3d 172 (D.C. Cir. 2002)...................................................39, 40

*Jordan v. U.S. Dep't of Justice*,
   591 F.2d 753 (D.C. Cir. 1978)................................ 12, 13, 17, 20, 21, 25, 27, 29

*Judicial Watch, Inc. v. Dep't of Justice*,
   432 F.3d 366 (D.C. Cir. 2005).............................................10, 35, 36

*Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*,
   926 F. Supp. 2d 121 (D.D.C. 2013)..................................13, 20, 25, 29

*Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution
   Trust Corp.*,
   5 F.3d 1508 (D.C. Cir. 1993)..........................................................21

*Lykins v. U.S. Dep't of Justice*,
   725 F.2d 1455 (D.C. Cir. 1984)......................................................10

*Martin v. Office of Special Counsel*,
   819 F.2d 1181 (D.C. Cir. 1987)......................................................35

*Mayer Brown LLP v. IRS*,
   562 F.3d 1190 (D.C. Cir. 2009)......................................................44

*Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*,
   566 F.2d 242 (D.C. Cir. 1977)...........................................22, 31, 32, 34

*Mervin v. FTC*,
   591 F.2d 821 (D.C. Cir. 1978)...........................................................35

*Multi AG Media LLC v. Dep't of Agric.*,
   515 F.3d 1224 (D.C. Cir. 2008)..........................................................21

*Nat'l Ass'n of Homebuilders v. Norton*,
   309 F.3d 26 (D.C. Cir. 2002).............................................................21

*NLRB v. Sears, Roebuck & Co.*,
   421 U.S. 132 (1975).............................................11, 17, 21, 22, 31

*PHE, Inc. v. U.S. Dep't of Justice*,
   983 F.2d 248 (D.C. Cir. 1993)...................... 41, 42, 43, 44, 45, 48, 49

*Pub. Employees for Envtl. Responsibility v. U.S. Section, Int'l
   Boundary & Water Comm'n, U.S.-Mexico*,
   740 F.3d 195 (D.C. Cir. 2014)........................................38, 39, 40, 45

*Rugiero v. U.S. Dep't of Justice*,
   257 F.3d 534 (6th Cir. 2001) ............................................................47

*Rural Hous. Alliance v. U.S. Dep't of Agric.*,
   498 F.2d 73 (D.C. Cir. 1974)..............................................38, 39, 40

*SafeCard Servs., Inc. v. SEC*,
   926 F.2d 1197 (D.C. Cir. 1991).........................................13, 15, 23

*Schiller v. NLRB*,
   964 F.2d 1205 (D.C. Cir. 1992).................... 10, 19, 26, 29, 32, 33, 35

*Schlefer v. United States*,
   702 F.2d 233 (D.C. Cir. 1983).........................................................31

*Senate of P.R. ex rel. Judiciary Comm. v. U.S. Dep't of Justice*,
   823 F.2d 574 (D.C. Cir. 1987)........................................12, 13, 22, 31

*Shapiro v. U.S. Dep't of Justice*,
   969 F. Supp. 2d 18 (D.D.C. 2013) .................................................. 16, 25

*Soghoian v. U.S. Dep't of Justice*,
   885 F. Supp. 2d 62 (D.D.C. 2012) ......................................................... 42

*Tax Analysts v. IRS*,
   117 F.3d 607 (D.C. Cir. 1997) ............................................... 31, 35, 36

*United States v. Deloitte LLP*,
   610 F.3d 129 (D.C. Cir. 2010) ........................................ 19, 33, 34, 35

*Williams v. U.S. Dep't of Justice, Drug Enforcement Admin.*,
   No. 85-6154, 1988 WL 76590 (D.C. Cir. May 18, 1988) ................... 47

## STATUTES

*5 U.S.C. § 552 ....................................................... 1, 5, 11, 32, 37, 38, 41

28 U.S.C. § 1291 ............................................................................... 1

28 U.S.C. § 1331 ............................................................................... 1

## OTHER AUTHORITIES

Kenneth C. Davis, *The Information Act: A Preliminary Analysis*, 34
   U. CHI. L. REV. 761 (1967) ................................................................ 22

Editorial: *Justice After Senator Stevens*, N.Y. TIMES, Mar. 18, 2012,
   *available at* http://goo.gl/fM7Ny4; .................................................... 3

*Ensuring that Federal Prosecutors Meet Discovery Obligations: Hr'g
   Before S. Comm. on Judiciary*, 112th Cong. (2012) ............................. 3

Fed. R. Civ. Proc. 26(b)(3)(A) ................................................................ 12

Federal Criminal Discovery issue of the United States Attorneys'
   Bulletin, *available at* http://www.justice.gov/sites/default/files
   /usao/legacy/2012/09/24/usab6005.pdf ..................................... 47, 48

*Federal Prosecutors Need To Play Fair with Evidence*, WASH. POST,
 Mar. 18, 2012, *available at* http://goo.gl/KAZBeB; ............................3

Letter from William Robinson III, Pres., Am. Bar Ass'n, to Sen. Lisa
 Murkowski, Mar. 15, 2012, *available at* http://goo.gl/APT8mL ........................3

*Prosecution of Former Sen. Ted Stevens: Hr'g Before H. Comm. on
 Judiciary*, 112th Cong. (2012) ................................................3

Report to Hon. Emmet G. Sullivan of Investigation Conducted
 Pursuant to the Court's Order, *In Re Special Proceedings*, No. 09
 Misc. 0198 (D.D.C. Mar. 15, 2012), *available at* goo.gl/uDCcKU ..................2

S. 2196, 112th Cong. (2012) ....................................................3

United States Attorneys' Manual, *available at*
 http://www.justice.gov/usam/united-states-attorneys-manual ...................47, 48

*Webster's Third New Int'l Dictionary* (1986)..................................45, 46

# <u>GLOSSARY</u>

DOJ          Department of Justice

EOUSA        Executive Office for United States Attorneys

FOIA         Freedom of Information Act

JA__         Joint Appendix

NACDL        National Association of Criminal Defense Lawyers

## STATEMENT OF JURISDICTION

The National Association of Criminal Defense Lawyers ("NACDL") filed this action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, to compel the Department of Justice ("DOJ") and the Executive Office for United States Attorneys ("EOUSA") to make available the Federal Criminal Discovery Blue Book ("Blue Book"). JA 7-44. The District Court had jurisdiction under 28 U.S.C. § 1331. On December 18, 2014, the District Court issued a final order granting defendants' motion for summary judgment and denying NACDL's cross-motion for summary judgment. JA 108. NACDL timely noticed its appeal on February 12, 2015. JA 123. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Whether a government manual that comprehensively conveys the law, policy, and practice of prosecutors' disclosure obligations may be withheld from the public on the ground that it constitutes attorney work product.

2.      Whether a government manual that comprehensively conveys the law, policy, and practice of prosecutors' disclosure obligations may be withheld from the public on the ground that it was compiled for law enforcement purposes and that producing it would disclose techniques, procedures, or guidelines for law enforcement investigations or prosecutions that could reasonably be expected to risk circumvention of the law.

## STATEMENT OF PERTINENT AUTHORITIES

The relevant excerpts of FOIA, 5 U.S.C. § 552, are reproduced in an addendum to this brief.

## STATEMENT OF THE CASE

This case concerns whether DOJ can keep secret a manual that it acknowledges it prepared to educate and regulate all federal prosecutors in connection with their constitutional, statutory, and ethical disclosure obligations. The District Court erroneously held that it could.

### A.    DOJ Created The Blue Book To Stem Systemic Discovery Abuses, And So Advised Congress.

A few months after former Senator Theodore ("Ted") Stevens was convicted of public corruption, DOJ discovered that certain federal prosecutors on the case had withheld significant exculpatory and impeachment evidence, in violation of their constitutional disclosure obligations.  A subsequent investigation by a court-appointed special counsel concluded that "[t]he investigation and prosecution of U.S. Senator Ted Stevens were permeated by the systematic concealment of significant exculpatory evidence which would have independently corroborated Senator Stevens' defense and his testimony, and seriously damaged the testimony and credibility of the government's key witness."  Report to Hon. Emmet G. Sullivan of Investigation Conducted Pursuant to the Court's Order, dated April 7, 2009 at 32, *In Re Special Proceedings*, No. 09 Misc. 0198 (D.D.C. Mar. 15, 2012),

*available at* goo.gl/uDCcKU.    In light of these violations, and on the Government's motion, the District Court ultimately set aside the verdict and dismissed the indictment against Senator Stevens.  Order, *United States v. Stevens*, No. 09 Crim. 231 (D.D.C. Apr. 7, 2009).

The discovery abuses in the Senator Stevens case garnered national attention. Following broad-based calls for reform and with bipartisan support, Senator Lisa Murkowski introduced the Fairness in Disclosure of Evidence Act, S. 2196, 112th Cong. (2012).  *See, e.g.*, Editorial: *Justice After Senator Stevens*, N.Y. TIMES, Mar. 18, 2012, *available at* http://goo.gl/fM7Ny4; *Federal Prosecutors Need To Play Fair with Evidence*, WASH. POST, Mar. 18, 2012, *available at* http://goo.gl/KAZBeB; Letter from William Robinson III, Pres., Am. Bar Ass'n, to Sen. Lisa Murkowski, Mar. 15, 2012, *available at* http://goo.gl/APT8mL.  The bill would have created a national standard governing prosecutors' disclosure of exculpatory evidence in federal criminal cases, to prevent the kinds of disclosure violations that occurred during the prosecution of Senator Stevens and in other cases. *See id.*  Congress held multiple hearings on the bill and on DOJ's disclosure violations in Senator Stevens' prosecution and elsewhere.  *Ensuring that Federal Prosecutors Meet Discovery Obligations: Hr'g Before S. Comm. on Judiciary*, 112th Cong. (2012); *Prosecution of Former Sen. Ted Stevens: Hr'g Before H. Comm. on Judiciary*, 112th Cong. (2012).

DOJ opposed the new legislation during the congressional hearings. It contended that no legislation was needed to prevent future disclosure violations because it had already initiated a series of reforms to address the issue. One of these reforms, DOJ told Congress, was its creation of a manual that "comprehensively covers the law, policy, and practice of prosecutors' disclosure obligations," known as the Blue Book. JA 60, 67. DOJ said that it distributed the Blue Book to "every federal prosecutor and paralegal." *Id.* According to DOJ, by instructing prosecutors about their discovery duties, the Blue Book would ensure they had "a full appreciation of their responsibilities" to provide appropriate discovery. JA 57, 66. The Blue Book would thus serve as a key "tool[]" for prosecutors "to meet their discovery obligations rigorously." JA 63, 72. After the hearings, Congress chose not take up Senator Murkowski's bill.

### B.    DOJ Has Refused To Make Public The Blue Book's Contents.

Notwithstanding the Blue Book's purportedly indispensable role in securing federal prosecutors' compliance with their disclosure obligations and its critical role in helping DOJ thwart new legislation, DOJ has kept the Blue Book's contents secret from the public and Congress alike.

To ascertain what reforms DOJ had implemented through its creation of the Blue Book, NACDL requested the Blue Book under FOIA on December 20, 2012. JA 27-30. EOUSA, an agency of DOJ, denied the request in full on February 28,

2013, claiming that the Blue Book could be withheld as attorney work product under FOIA's Exemption 5, or as law enforcement information under FOIA's Exemption 7(E).  *See* JA 32-33; 5 U.S.C. § 552(b)(5) (exemption for "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency"); *id.* § 552(b)(7)(E) (exemption for "records or information compiled for law enforcement purposes [whose production] would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law").  NACDL filed an administrative appeal; DOJ affirmed, this time only asserting Exemption 5 for work product.  JA 35-37, 41-42.

### C.     The District Court Allowed DOJ To Keep Secret The Contents Of The Blue Book.

After exhausting the administrative process, NACDL filed suit in the District Court to compel production of the Blue Book.  JA 7-44.  DOJ and EOUSA moved for summary judgment, arguing that the Blue Book was exempt from disclosure under both Exemption 5 and Exemption 7(E).  (Dkt. 13.)  NACDL cross-moved, contending that neither exemption applied.  (Dkt. 16.)

The District Court ordered DOJ to produce the Blue Book for its *in camera* review.  JA 4 (Minute Order dated Oct. 6, 2014).  The court then resolved the two motions on the basis of Exemption 5 alone.  Upon reviewing the Blue Book, the

District Court confirmed that it "contain[s] general background information and agency policies regarding the government's discovery obligations."   JA 119. However, the court found that the Blue Book also contains some "advice and litigation strategy."   *Id.*   In light of the latter, the court concluded that the Blue Book was "prepared in anticipation of foreseeable litigation against [DOJ]."   JA 116.   And, on that basis, the District Court determined that the Blue Book was attorney work product that was properly withheld.   JA 119.   In so holding, the District Court admitted that it was disagreeing with another district court that had recently reviewed the Blue Book and rejected DOJ's work-product claim, ordering DOJ to produce the Book (under seal, in light of this case, which was pending before the District Court at the time).   *See* JA 76-78 (Order, *United States v. Pederson*, No. 12 Crim. 431 (D. Or. Mar. 27, 2014)) (concluding that the "Blue Book was created as a training tool to assist the government in meeting its discovery obligations in criminal cases" and was not work product, and requiring that DOJ produce it to the defense).

Although the District Court below observed that the Blue Book contained certain material that did not even arguably constitute "advice" or "strategy," the court held that *no part* of the Blue Book needed to be segregated and produced to NACDL.   JA 119, 122.   Rather, because there was a "sufficient" amount of "advice and litigation strategy" in the Blue Book, the court reasoned, the *entire*

publication was protected as work product, and even the parts containing "general background" and agency "policies" could be kept secret. JA 119; *see also* JA 114-15. The District Court declined to address whether FOIA Exemption 7(E) independently covered the Blue Book. JA 113.

The District Court entered final judgment for Defendants on December 18, 2014. JA 108. NACDL timely noticed its appeal on February 12, 2015. JA 123.

## SUMMARY OF ARGUMENT

The District Court erred in allowing DOJ to keep the Blue Book secret. Drafted on the heels of the tainted prosecution of Senator Stevens, the Blue Book was part of DOJ's public promise to prevent future discovery abuses, by educating and regulating its prosecutors. Yet now that Congress has assented to DOJ's insistence on self-education and self-regulation, DOJ seeks to hide one of the very tools it touted would put its promise into effect. Such secrecy—irreconcilable at once with both the Blue Book's public purpose and FOIA's policy of openness—should not be allowed.

I.    The Blue Book is not work product under Exemption 5, because it was not created "in anticipation of litigation" within the meaning of the work-product doctrine. True, the Book is *about* litigation. But the context of its creation, its content, and its function all indicate that it represents DOJ's policies and restatement of the law *governing* its litigation activity—rather than a strategic

effort to *prevail* in litigation.  Indeed, the Blue Book was drafted not with any particular claim (or even transaction) in mind, but for use in *all* federal criminal cases.  By design, it lays out DOJ's interpretation of, and executive policies about, its prosecutors' disclosure duties.  And its express function is to educate all DOJ prosecutors about their disclosure obligations in order to *protect* their adversaries, not to help prosecutors *defeat* their adversaries in court.  Because, as these indicators suggest, DOJ created the Book in its capacity as executive policymaker and decisionmaker, not as an adversarial litigator, shielding the Blue Book would not align with the fundamental purpose of the work-product privilege: to protect the adversary process.  Therefore, and in light of FOIA's dominant objective of openness and aversion to the kind of secret law the Blue Book contains, the Blue Book must be disclosed.

Even if some parts of the Blue Book were work product, DOJ could not shield the Book in its entirety.  The District Court expressly found that much of the Blue Book is devoted to outlining DOJ's policies on and understanding of its discovery obligations.  Such classic working law, which does not constitute work product, does not somehow transform into protected work product simply because litigation advice or strategy is included alongside it, in the same book.  If it were otherwise, agencies could insulate *all* documents—even multi-chapter manuals like this one—by intermixing a "sufficient" amount of legal strategy with unprotected

material, and thereby defeat FOIA's objective.  FOIA's segregability requirement

prevents such circumvention.  Under that requirement, even if some parts of the

Blue Book are properly withheld as work product, the remaining parts must be

disclosed.

**II.**     Nor is the Blue Book a sensitive law-enforcement technique,

procedure, or guideline that may be withheld under Exemption 7(E).  In the first

place, it was not compiled for law enforcement purposes.  Although created by a

law enforcement agency (and therefore related to law enforcement by definition), it

was created in connection with the agency's oversight of its employees' duties, not

to investigate or punish wrongdoing.  Nor could disclosure of the Blue Book

conceivably risk circumvention of law.  At most, its disclosure would help criminal

defendants *enforce* the law—but DOJ cannot provide any coherent account of how

it could help defendants *circumvent* it.  In any event, the segregability requirement

applies in this context as well, and it is certain that at least DOJ's discussion of its

general policies and obligations does not qualify as exempt under Exemption 7(E).

At minimum, those parts of the Blue Book must be released.

## <u>STANDARD OF REVIEW</u>

This Court reviews *de novo* a district court's grant of summary judgment in

a FOIA case, remaining "mindful that the 'burden is on the agency' to show that

requested material falls within a FOIA exemption." *Burka v. U.S. Dep't of Health & Human Servs.*, 87 F.3d 508, 514 (D.C. Cir. 1996).

This Court routinely reviews *in camera* documents at the heart of a FOIA dispute, and it should do so here. *See, e.g.*, *Judicial Watch, Inc. v. Dep't of Justice*, 432 F.3d 366, 370 (D.C. Cir. 2005); *Schiller v. NLRB*, 964 F.2d 1205, 1208 (D.C. Cir. 1992); *Lykins v. U.S. Dep't of Justice*, 725 F.2d 1455, 1465 (D.C. Cir. 1984).

## ARGUMENT

## I.    THE BLUE BOOK MAY NOT BE CATEGORICALLY WITHHELD UNDER EXEMPTION 5 BECAUSE IT IS NOT WORK PRODUCT.

There is no dispute that FOIA does not entitle NACDL or anyone else to demand a government agency's confidential attorney work product.  But the Blue Book—a general manual that directs federal employees how to comply with their statutory and constitutional discovery obligations—is not such a document.  It is *about* litigation, to be sure, just like nearly every document created by DOJ.  It was not, however, created "in anticipation of litigation" within the special meaning of the work-product doctrine.  Rather, it is no different from any other manual or guidance document governing an agency's operating procedures, presumptively available to the public under FOIA's directive against "secret" agency law.

In holding to the contrary, the District Court doubly erred.  *First*, the court afforded the work-product privilege too broad a scope, paying insufficient heed to the fact-intensive analysis necessary to distinguish genuine "work product"—*i.e.*,

materials created with the intent and effect of helping the agency to prevail within the adversarial process—from routine materials that simply guide the agency in its role of executing the law. *Second*, the District Court wrongly held that inserting limited work-product-protected material into a document that is otherwise not exempt effectively immunizes *the entire document* from disclosure. That holding rested on a misinterpretation of this Court's cases and cannot be correct.

### A. The Work-Product Privilege Shields Only Strategic, Adversarial Documents That Address A Specific Claim Or Transaction, Not Policy Guidelines Created In The Ordinary Course Of Business.

Although FOIA requires federal agencies to make publicly available a broad array of internal documents and materials, *see* 5 U.S.C. § 552(a), the statute also includes a series of exemptions from that mandate, *see id.* § 552(b). Exemption 5, in particular, exempts from such disclosure any documents "which would not be available by law to a party other than an agency in litigation with the agency." *Id.* § 552(b)(5). That is, it permits the Government to withhold "those documents, and only those documents, normally privileged in the civil discovery context." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975). Attorney work product is one such category of privileged documents. *See id.* at 154 ("Congress had the attorney's work-product privilege specifically in mind when it adopted Exemption 5.").

11

The definition of work product is easy to state: The basic rule is that the work-product privilege applies to materials prepared "in anticipation of litigation." *See* Fed. R. Civ. Proc. 26(b)(3)(A) (qualified privilege for documents "prepared in anticipation of litigation"); *Jordan v. U.S. Dep't of Justice*, 591 F.2d 753, 774-75 (D.C. Cir. 1978) (en banc).  Applying that rule, though, "is not without difficulties." *EPA v. Mink*, 410 U.S. 73, 86 (1973).  Indeed, to distinguish work product from other agency materials, as this Court has admitted, is "difficult."  *Senate of P.R. ex rel. Judiciary Comm. v. U.S. Dep't of Justice*, 823 F.2d 574, 587 (D.C. Cir. 1987).

This difficulty is particularly pronounced in the context of those government agencies whose primary function is or includes litigation, such as DOJ.  As this Court has pointed out, "the prospect of future litigation touches virtually any object of a DOJ attorney's attention."  *Senate of P.R.*, 823 F.2d at 586-87.  Thus, if Exemption 5 permitted those agencies "to withhold any document prepared by any person … with a law degree simply because litigation might someday occur, the policies of the FOIA would be largely defeated."  *Id.* at 587 (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 865 (D.C. Cir. 1980)); *see also Bristol-Meyers Co. v. FTC*, 598 F.2d 18, 29 (D.C. Cir. 1978) ("The executive branch of our government employs an uncountable and ever-growing number of attorneys, and [Exemption 5] can hardly be understood as protecting everything they put on paper.").  Indeed, if "read over-broadly," Exemption 5 "could preclude

12

almost all disclosure from an agency with substantial responsibilities for law enforcement." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1203 (D.C. Cir. 1991).

Accordingly, the courts have recognized that, particularly in the context of agencies with substantial litigation responsibilities, a document is not work product just because it is created with litigation in mind, even when it is specifically *about* litigation. *E.g.*, *Jordan*, 591 F.2d 753 at 775-76 (rejecting work-product protection for document discussing when prosecutors should and should not bring criminal charges); *Am. Immigration Council v. U.S. Dep't of Homeland Sec.*, 905 F. Supp. 2d 206, 222 (D.D.C. 2012) (rejecting work-product protection for slides directing agency's attorneys how to behave in adjudicative proceedings, even though they were "literally 'in anticipation of litigation,'" because "they [did] not anticipate litigation in the manner that the [work-product] privilege requires"); *Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 926 F. Supp. 2d 121, 142 (D.D.C. 2013) (rejecting work-product protection for document outlining general standards for government immigration attorneys' exercise of prosecutorial discretion).

Rather, FOIA requires an "inherently fact-dependent" inquiry, *Senate of P.R.*, 823 F.2d at 587, that focuses more closely on the underlying purpose of the work-product privilege—namely, "to protect the adversary trial process," *Coastal States*, 617 F.2d at 864. When government lawyers are seeking to maximize the agency's likelihood of success "*within the framework of the adversary system*," *Jordan*, 591

13

F.2d at 775 (emphasis added), granting protection accords with that purpose. But agency lawyers often act in other capacities—*e.g.*, setting policy, or helping the agency satisfy its constitutional mandate to execute the law. The purpose of the work-product doctrine is simply not implicated in those contexts, even when the lawyer's work touches on actions taken in court. To distinguish these roles, and thus determine whether a document has a sufficiently direct relationship with an agency's strategic effort to prevail in the adversarial process, courts look to the context of the document's creation, to its content, and to its function—all in light of FOIA's presumption of openness.

Those factors are outlined, in turn, below. And, as explained further in Part I.B, *infra*, applying each factor demonstrates that the Blue Book is not protected work product. Rather, because the Book (i) relates to criminal discovery generally, rather than any particular case or transaction; (ii) contains objective analysis of prosecutors' legal obligations, rather than strategic advice for prosecutors to *avoid* those obligations; (iii) was created, as DOJ advised Congress, to convey agency policies and ensure compliance with the law, rather than to win discovery disputes in court; and (iv) represents classic working law at the heart of FOIA's purposes, disclosing the Blue Book would not interfere with the adversary trial process.

### 1.     *Context of the document: Specific claim or general topic?*

In determining whether a document constitutes work product, this Court has long looked to whether, when it was "prepared," the drafter had "in mind" not just litigation in general, but "a *specific* claim supported by *concrete* facts which would likely lead to litigation."  *Coastal States*, 617 F.2d at 865 (emphases added).  If so, that factor is suggestive of work product: The existence of a specific claim makes it highly likely that the drafter's focus had crystallized and narrowed to defeating the agency's adversary, in court, on that claim.  But if the document addresses a general topic outside the context of a particular claim, that points in the opposite direction.  In that situation, the lawyer is far more likely to be acting in the role of *policymaker* or *executive decisionmaker* than *adversarial litigator*.

Thus, for example, the materials at issue in *SafeCard* were work product, as lawyers prepared them for "*active* investigations into potentially unlawful stock trades by *specific* individuals."  926 F.2d at 1202 (emphases added); *see also id.* at 1203 (finding work product "where an attorney prepares a document in the course of an *active* investigation focusing upon *specific* events and a *specific* possible violation by a *specific* party" (emphases added)).  In that context, the presumption is, sensibly, that the lawyer is already submerged in the adversary trial process.

By contrast, in *Coastal States*, the legal memoranda at issue were not work product, because they were written *before* any investigation had been opened,

*before* any "charge had been made," and *before* any "violation [was] necessarily suspected." 617 F.2d at 858. Given that disconnect between the drafting and any concrete litigation, the memoranda were better characterized as *general* analyses relevant to the agency's role in executing the law—not as strategic materials anticipating a *particular* litigation battle. *See Shapiro v. U.S. Dep't of Justice*, 969 F. Supp. 2d 18, 34 (D.D.C. 2013) (holding that document's "generalness … defeats a finding that disclosure would reveal the thought processes of the attorney").

To be sure, absence of a "specific claim" is not necessarily dispositive in all cases. This Court has applied the privilege to documents a lawyer created while preparing to defend a client in potential litigation over a particular *transaction*, despite the fact that no specific *claim* had yet arisen. *In re Sealed Case*, 146 F.3d 881, 885-86 (D.C. Cir. 1998). In that context—where lawyers act *defensively*, *e.g.*, "as legal advisors protecting their agency clients from the possibility of future litigation"—absence of a identifiable "claim" is less probative than where lawyers act *offensively*, "as prosecutors or investigators of suspected wrongdoers." *Id.* at 885, 887. But, either way, existence of a specific claim is "one factor that courts should consider in determining whether the work-product privilege applies." *Id.* at 887. And, either way, the caselaw places considerable focus on whether the work was done in relation to a *particular matter* (whether a "claim" or "transaction"), to ensure that there exists some meaningful nexus to the adversarial trial process.

16

## 2. *Content of the document: Strategy or neutral analysis?*

Not surprisingly, courts evaluating work-product claims also look to the disputed document's content.  At one end of the spectrum, documents that consider the particulars of a matter and strategize about chances of prevailing are likely to be work product.  *See Sears*, 421 U.S. at 154 (describing privilege as applicable to documents that set forth the "attorney's theory of the case" or "litigation strategy").  That content may indicate that the writer was acting in the role of a trial adversary, triggering the doctrine's purpose.  At the other end of the spectrum, documents that neutrally flesh out the meaning of legal obligations binding the agency reflect a concern, not with the adversary trial process, but rather with execution of the law.  And that interest does not implicate the work-product rationale.

Accordingly, the privilege often extends to "legal theories or legal strategies relevant to any on-going or prospective trial." *Jordan*, 591 F.2d at 775-76.  Thus, this Court applied it to memoranda that "advise[d] [an] agency of the types of legal challenges likely to be mounted against a proposed program, potential defenses available to the agency, and the likely outcome," because their content was focused on success before the courts.  *Delaney, Migdail & Young, Chartered v. I.R.S.*, 826 F.2d 124, 127 (D.C. Cir. 1987).  The memos did not "fles[h] out the meaning of the statute," but rather evaluated the likely "outcome" of the adversarial process and strategized about how the agency could best "defen[d]" its policy.  *Id.*

17

By contrast, the memoranda in *Coastal States* were *not* protected, because they provided "neutral, objective analyses" of statutes and regulations. 617 F.2d at 863. Although the meaning of those laws was certain to matter in litigation, the memoranda did not "counse[l]" the agency on how to "protec[t] its interests," but rather analyzed them neutrally and fairly, akin to "question and answer guidelines which might be found in an agency manual." *Id.*; *see Delaney*, 826 F.2d at 127 (distinguishing *Coastal States* memoranda as "like an agency manual, fleshing out the meaning of the statute it was authorized to enforce"). Similarly, *American Immigration Council* denied protection to a memo analyzing the right to counsel in refugee cases—even though it related *exclusively* to litigation—because it was not "plotting litigation strategy" or even considering "whether a court … is likely to uphold some proposed agency interpretation"; rather, it objectively sought "the best interpretation of the regulation at issue." 905 F. Supp. 2d at 222.

This consideration of a document's content works in tandem with evaluating whether it was driven by a specific claim or transaction. Indeed, the "specific claim requirement" helps distinguish materials that "advis[e] … how to proceed with specific investigations" from those that are "'neutral, objective analyses.'" *Sealed Case*, 146 F.3d at 885. Ultimately, both factors seek to identify when a government lawyer has transitioned from *executing the law* (which should be a transparent function) to *prevailing in court* (which requires confidentiality).

18

### 3.      *Function of the document: Advise tactics or convey policies?*

The work-product analysis looks not only at a document's overall content and the context for its creation, but also more carefully at its *function* or *purpose*. This Court has noted, indeed, that the "function of the documents" is "critical" to the analysis. *Delaney*, 826 F.2d at 127; *see also United States v. Deloitte LLP*, 610 F.3d 129, 137 (D.C. Cir. 2010). The purposes of the work-product doctrine are often implicated when a document's function is to *advise or counsel* an agency on *how to prevail in litigation*. Confidentiality of such materials may be necessary for the adversarial trial process to work. At the same time, if the function of a document is merely to *convey agency policies*—even if the particular policies will be applied in future litigation—that speaks to the government's broader law-execution role, not its narrower adversarial-litigation role. It is the difference between "here is how to convince a court" versus "here is how to execute the law."

Illustrating the quintessential case, *Schiller v. NLRB* considered documents providing "tips" and "advice" for "how to litigate" a particular kind of case, even "including arguments and authorities" the agency could cite to a court. 964 F.2d at 1208-09. The manifest function of these documents was to help the agency win in litigation, providing a direct link to the adversarial process sufficient to trigger the privilege. *See id.* Similarly, *Delaney* emphasized that the function of the materials there was to advise the agency about legal arguments that could be raised against it

19

in future litigation.  Indeed, the FOIA plaintiff did not want the documents because they exposed "the agency's view of the law"—they did not—but rather because they identified its "legal vulnerabilities."  826 F.2d at 127.  Granting such access would improperly disrupt and invade the ordinary adversarial process.  *Id.*

However, in *Jordan*, this Court concluded that documents outlining policies regarding when prosecutors should (or should not) initiate criminal litigation was not work product.  591 F.2d at 775-76.  Those materials merely set forth "general standards to guide … Government lawyers" in the execution of their day-to-day law-enforcement duties, but were not designed to increase the likelihood of, *e.g.*, obtaining convictions or convincing courts to impose higher sentences.  *See id.*  Of course, the policies being conveyed *concerned* litigation, but that did not change the fact that they transcended DOJ's adversarial-litigation role and were intended to *instruct* agency employees, not to *counsel* them.  Similarly, the materials at issue in *Judicial Watch* provided "general standards to instruct ICE staff attorneys in determining whether to exercise prosecutorial discretion," 926 F. Supp. 2d at 142; but they did not relate to *prevailing* in litigation, and so did not warrant protection, *see id.*  Likewise, *American Immigration Council* denied work-product protection to material "convey[ing] routine agency policies" about how agency lawyers ought to interact with private lawyers, even though "those policies … appl[ied] in agency litigation," exclusively.  905 F. Supp. 2d at 222.

20

In short, materials that serve no *adversarial function*, like general guidelines or policy manuals, are not work product.  They relate instead to the agency's *law-execution* function—effectively serving as the public-sector equivalent of materials "assembled in the ordinary course of business," which are not privileged.  *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp.*, 5 F.3d 1508, 1515 (D.C. Cir. 1993); *accord In re Sealed Case*, 146 F.3d at 887.  If the law were otherwise, agency lawyers whose "ordinary course of business" is helping  an agency to properly execute the law would generate work product whenever they put pen to paper.  That would defeat the purpose of FOIA and extend work-product protection well beyond its modest scope.  *See Jordan*, 591 F.2d at 775.

### 4.    *Presumption of disclosure and aversion to "secret" law.*

In the course of evaluating a document's context, content, and function, and regardless of the precise circumstances, courts "[a]t all times … must bear in mind that FOIA mandates a 'strong presumption in favor of disclosure.'"  *Multi AG Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1227 (D.C. Cir. 2008) (quoting *Nat'l Ass'n of Homebuilders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002)); *accord Burka v. U.S. Dep't of Health & Human Servs.*, 87 F.3d 508, 515 (D.C. Cir. 1996).  That is because "disclosure, not secrecy, is the dominant objective of the Act."  *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976).  In particular, FOIA "represents a strong congressional aversion to 'secret agency law.'"  *Sears*, 421 U.S. at 153.

Accordingly, the "[e]xemptions to the FOIA are to be construed narrowly." *Hayden v. Nat'l Sec. Agency*, 608 F.2d 1381, 1386 (D.C. Cir. 1979); *accord Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 252 (D.C. Cir. 1977) (agreeing that "FOIA exemptions should be narrowly construed"). Indeed, it is "fundamental[]" that "Congress intended to confine exemption (b)(5)," especially, "'as narrowly as is consistent with efficient Government operation.'" *Senate of P.R.*, 823 F.2d at 584 (quoting *Coastal States*, 617 F.2d at 868). And it is therefore "the agency invoking a FOIA exemption" that "bears the burden" of establishing that it applies, *id.* at 585, including by demonstrating that "disclosure would defeat, rather than further, the purposes of the FOIA," *Mead*, 566 F.2d at 258.

In effect, to the extent that there are doubts regarding whether a document is work product, courts should err on the side of disclosure—not secrecy. *See Mead*, 566 F.2d at 259 ("Where there is a balance to be struck, Congress and the courts have stacked the scales in favor of disclosure and against exemption."). And that is particularly so when finding the material exempt would risk keeping secret "the kind of agency law in which the public is so vitally interested and which Congress sought to prevent the agency from keeping secret," *Sears*, 421 U.S. at 156—*i.e.*, "the agency's effective law and policy," Kenneth C. Davis, *The Information Act: A Preliminary Analysis*, 34 U. CHI. L. REV. 761, 797 (1967). The factors discussed above reflect that same goal, and the presumption further underscores it.

**B.    Under These Principles, The Blue Book Is Not Work Product, And The District Court Erred By Concluding Otherwise.**

Consideration of the relevant factors compels the determination that the Blue Book does not constitute work product.  The Blue Book is a *general manual* that *instructs* prosecutors about their constitutional and statutory discovery obligations *in all cases* and *conveys DOJ's policies* regarding the same.  And it was created, as DOJ itself told Congress, to *prevent discovery abuses*, not to provide litigation tips on how to undermine constitutional rights or maximize convictions.  The District Court thus erred in allowing DOJ to keep the Book secret, especially since it represents classic agency "working law" that Congress intended be public.

**1.    The Blue Book relates to discovery in general, but not to any specific "claim" or even any specific "transaction."**

At the outset, DOJ indisputably did not have "in mind," when it wrote the Blue Book, any "specific claim supported by concrete facts which would likely lead to litigation."  *Coastal States*, 617 F.2d at 865.  DOJ was not focused on any "specific even[t]" or "specific possible violation" by a "specific party."  *SafeCard*, 926 F.2d at 1203.  Nor was the Blue Book prepared in connection with an ongoing, "active investigation."  *Id.*  Rather, the Blue Book addresses DOJ's discovery obligations *generally*.  That is presumably why the Blue Book was disseminated to "every federal prosecutor and paralegal," rather than just those working on a specific matter.  JA 60, 67.  And it is presumably why DOJ testified before

Congress that the Blue Book obviated the need for public legislation clarifying DOJ's *general* discovery duties. JA 57, 65-66. As this general context relates to DOJ's broader law-execution role rather than its narrower adversarial-litigation role, it cuts strongly against finding the Blue Book to be protected by the work-product doctrine.

Indeed, because DOJ lawyers are "prosecutors or investigators of suspected wrongdoers," the absence of a specific claim in this case is dispositive, as it was in *Coastal States*. *See Sealed Case*, 146 F.3d at 885. The District Court, however, did not apply the "specific claim" test, refusing to recognize the material doctrinal distinction between a government lawyer acting as a prosecutor versus one acting defensively. JA 115-16. Only in the latter context has this Court loosened the "specific claim" test and focused instead on the existence of a particular "transaction," in view of the broader adversarial frame of a lawyer seeking to *protect* agencies from future suits. *See id.* The District Court erred by straying from that distinction.

Even more importantly, the Blue Book does not warrant protection even under the looser "particular transaction" test, *Sealed Case*, 146 F.3d at 885. Unlike *Delaney*, the Blue Book does not address legal issues potentially arising from a particular government program. *Cf.* 826 F.2d at 127. And unlike in *Sealed Case*, the Blue Book does not focus on a single relationship or event subject to potential

legal challenge. *Cf.* 146 F.3d at 885-86. Rather, it bears upon, and serves as a resource for, DOJ's *general* course of conduct in *all* of its criminal prosecutions. *Cf. Shapiro*, 969 F. Supp. 2d at 34 (refusing work-product privilege to compilation of briefs that was "necessarily general in order to serve as a resource to agency lawyers litigating FOIA cases," because such "generalness … defeats a finding that the compilation is sufficiently tethered to any anticipated litigation").

Proving the point, the District Court identified the relevant "transaction" that the Blue Book addresses as "discovery," writ large. JA 118. That is far too generalized a "transaction" to raise the concerns animating work-product doctrine. "Discovery" is what DOJ does in the ordinary course of its law-enforcement business; it cannot be that any policies or analysis on that subject are shielded from public scrutiny, any more than policies about charging decisions, about sentencing requests, or about plea bargaining. *See Jordan*, 591 F.2d at 775; *Judicial Watch*, 926 F. Supp. 2d at 142. To the contrary, that broad focus confirms that the Blue Book lacks the nexus to concrete adversarial litigation demanded by the doctrine.

### 2. *The Blue Book compiles and summarizes the law governing criminal discovery, but does not plot litigation strategy.*

The Blue Book's content confirms it does not fall within the ambit of the work-product privilege. The Book contains "comprehensive guidelines" about criminal discovery (JA 90, 99) and neutral, objective analysis of DOJ's obligations. As the District Court found, it identifies "the legal sources of [DOJ's]

discovery obligations," "provides background information and instruction on discovery practices," and conveys "agency policies regarding the government's discovery obligations." JA 115, 117, 119. The Book is thus like "an agency manual," *Coastal States*, 617 F.2d at 863; *see also* JA 52, 93 (calling Book a "litigation manual"), neutrally "fleshing out the meaning of" the rules that DOJ must abide by, *Delaney*, 826 F.2d at 127. The Blue Book does not "plo[t] litigation strategy," but outlines "the best" understanding of DOJ's obligations. *Am. Immigration*, 905 F. Supp. 2d at 222.

To be sure, the District Court concluded that the Blue Book *also* contains "advice, strategy, and defenses for litigation related to the government's discovery obligations." JA 117. But even if the Blue Book contained such "advice" or "strategy," this would not indicate that it is work product, since the Book's context and function strongly suggest the contrary. *See supra*, Part B.1; *infra*, Part B.3. In any event, there is reason to doubt that the Book contains true litigation advice.

First, while NACDL is "at a disadvantage" in arguing about the Book's contents because it "ha[s] not seen" it, *Schiller*, 964 F.2d at 1209, NACDL does know that DOJ described the Book to Congress as a manual that "comprehensively covers the law, policy, and practice of prosecutors' disclosure obligations," JA 60, 67, with nary a mention of any "advice" or "strategy." Moreover, the District Court seems to have construed the concepts of "advice" and "strategy" too broadly.

It quoted the Vaughn Index's descriptions of the Book as "encourag[ing] certain practices and discourag[ing] others" and "identif[ying] factors prosecutors should consider in making particular decisions," among other things.  JA 116.  But there is a material difference between encouraging a practice *because it will help ensure victory in litigation* versus encouraging it *because the agency's view of the law requires it.*  Only the former, not the latter, points to work-product protection.  *Am. Immigration*, 905 F. Supp. 2d at 222.  Likewise, if DOJ directs prosecutors, *as a matter of policy*, rather than *a matter of tactics*, to base decisions on certain factors, that is simply a policy manual—not work product.  *Jordan*, 591 F.2d at 775.

This Court should therefore review the Blue Book *in camera* with a closer eye to whether its content truly reflects "legal theories or legal strategies relevant to any on-going or prospective trial," *Jordan*, 591 F.2d at 775-76, or is better characterized as containing "neutral, objective analyses" that seek to "fles[h] out the meaning" of constitutional and statutory doctrines that govern DOJ's criminal discovery, as DOJ itself told Congress.  *Coastal States*, 617 F.2d at 863; *Delaney*, 826 F.2d at 127.  If portions of the Blue Book truly contain the kind of legal advice and strategy suggestive of work product, the Court should consider whether the nonadversarial context of the Blue Book's creation, the Book's defendant-protective function, and FOIA's presumption of openness nonetheless compel disclosure.  (And if the Court finds that certain portions of the Blue Book

constitute work product, the Book must be segregated, not withheld entirely.  *See infra* Part I.C.)

### 3. *DOJ created the Blue Book to educate prosecutors about and ensure their compliance with their legal obligations, not to help prosecutors prevail in discovery disputes.*

The express function of the Blue Book underscores that it does not play the sort of adversarial role that implicates work-product protection.  As DOJ itself explained to Congress, the Blue Book's purpose is to teach prosecutors about the scope of their discovery obligations, to ensure that they do not violate those obligations going forward.  It is a critical "tool[]" for prosecutors "to meet their discovery obligations rigorously," and was designed to ensure that they have "a full appreciation of their responsibilities" with respect to discovery.  JA 57, 63, 66, 72.  Drafted against the backdrop of Senator Stevens' prosecution, its express purpose was "to ensure that prosecutors, agents, and paralegals have the necessary training and resources to fulfill their legal and ethical obligations with respect to discovery in criminal cases."  JA 57; *accord* JA 58, 63, 65, 72.  Indeed, DOJ advised Congress that any legislation to standardize discovery practices was "unnecessary," given that it had already implemented reforms, including the Blue Book.  JA 57, 61.

In short, the function of the Blue Book is to protect *criminal defendants* by training prosecutors on their legal responsibilities.  This educational, defendant-

protective function is not adversarial; unlike in *Schiller*, for example, it does not provide "tips" for how to *win* in litigation. 964 F.2d at 1208-09. To the contrary, the Blue Book's function—to enhance prosecutors' compliance with constitutional, statutory, and ethical requirements that require them to share exculpatory and other information with defendants—if anything, *impedes* convictions (albeit only *unfair* convictions). Put another way, the Blue Book clearly directs prosecutors how to act *in* litigation, but just as clearly not for the purpose of *prevailing* in litigation (or any particular litigation). The closer analogy is thus to ordinary course-of-business guidance materials that help ensure government officials' compliance with agency law and policy, like those that were ordered disclosed in *Jordan*, *Judicial Watch*, and *American Immigration Council*—not to strategic memos like in *Delaney*.

The District Court acknowledged that "the overarching purpose driving the contents and structure of the book was to prevent discovery violations." JA 119; *accord* JA 118. But the court drew the wrong legal conclusion from that undisputed fact, apparently believing that because DOJ hoped the Blue Book would "prevent" discovery *violations*, it would also avoid discovery *disputes* and thus serve DOJ's interests within the "adversarial trial process." JA 118; *see also* JA 119 (reasoning that Blue Book would "prevent … litigation arising from discovery transactions"). The court thus conflated a desire to abide by the law with a desire to prevail in court.

That reasoning cannot be correct.  It is true, of course, that compliance with the law will help DOJ in future litigation alleging noncompliance.  But that proves too much: It would be equally true of *any* agency manual or guideline that instructs employees on their legal duties and how to comply with them, and even of formal regulations seeking to properly implement statutory responsibilities.  Nevertheless, the primary function of such materials is plainly not to get a leg-up in hypothetical future litigation, but to satisfy the agency's fundamental duty to execute the law.

Indeed, surely even DOJ would concede that its interest in complying with *Brady* and similar discovery rules transcends the goal of prevailing in adversarial disputes with defendants.  *E.g.*, JA 107 (Goldsmith supp. declaration) ("Clearly, the responsibilities of a prosecutor go beyond those of an ordinary litigant.").  Such compliance is a critical *prerequisite* to having a fair adversarial process in the first place—to ensuring the "integrity of our criminal justice system."  JA 58-59.  By the same token, NACDL's interest in viewing the Blue Book is not to identify "legal vulnerabilities" to *exploit in the adversarial process*, *Delaney*, 826 F.2d at 127, but to *ensure the integrity of that process*.  That goal is fully consistent with the objective of the work-product doctrine.

**4.**    Finally, if the Court is left with any doubt over whether the context, content, and function of the Blue Book reflect that its authors were acting in their policymaking and law-execution capacity, as opposed to their role as strategists

within "the adversary trial process," *Coastal States*, 617 F.2d at 864, FOIA's "dominant objective" resolves it in favor of "disclosure," *Rose*, 425 U.S. at 361.

FOIA, after all, "represents a strong congressional aversion to 'secret agency law.'" *Sears*, 421 U.S. at 153. "A strong theme of our [FOIA] opinions has been that an agency will not be permitted to develop a body of 'secret law,' used by it in the discharge of its regulatory duties and in its dealings with the public, but hidden behind a veil of privilege." *Coastal States*, 617 F.2d at 867; *see also Tax Analysts v. IRS*, 117 F.3d 607, 619 (D.C. Cir. 1997) (denying attempts to shield "growing body of agency law from disclosure to the public"); *Schlefer v. United States*, 702 F.2d 233, 235 (D.C. Cir. 1983) (requiring disclosure of materials that "interpret[ed] statutes relevant to the Agency's dealings" and "address[ed] questions of Agency policy"). And the Blue Book is exactly that: DOJ's "effective law and policy," Davis, *supra*, at 797, in the area of criminal discovery. It directly substituted for legislation by Congress, instructing prosecutors on the "law, policy, and practice of [their] disclosure obligations." JA 60, 67. In short, it is DOJ's working law—and, absent disclosure here, will remain hidden from public view and scrutiny.

For those reasons, DOJ cannot "bea[r] [its] burden" of establishing that "disclosure would defeat, rather than further, the purposes of the FOIA," *Senate of P.R.*, 823 F.2d at 584; *Mead*, 566 F.2d at 258. And, in the absence of such a showing, Exemption 5 should be "construed narrowly," *Hayden*, 608 F.2d at 1386,

"in favor of disclosure," *Mead*, 566 F.2d at 259. FOIA's purposes thus point in the same direction as evaluation of the Blue Book's context, content, and function: The Book must be disclosed.

### C. Adding Work Product To An Otherwise Unprivileged Document Does Not Somehow Cloak The Entire Document In Privilege.

At a minimum, DOJ must make the Blue Book available in redacted form, excising any genuine work-product material. After all, even the District Court acknowledged that much of the Blue Book is devoted to conveying agency policies and background rules for criminal discovery, distinct from any strategic or tactical advice. And the ordinary rule under FOIA, regardless of which exemption is claimed, is that segregation and redaction are mandatory. The District Court thus erred by holding that so long as a document contains a "sufficient" amount of work product, the entire document is immunized from disclosure—a rule that, if affirmed here, would give agencies a foolproof way to evade FOIA's mandate.

1.    FOIA itself expressly provides that, even if a document includes some exempt information, "[a]ny reasonably segregable portion … shall be provided … after deletion of the portions which are exempt." 5 U.S.C. §552(b). And as this Court has explained, "[t]he focus of the FOIA is information, not documents, and an agency cannot justify withholding an entire document simply by showing that it contains some exempt material." *Mead*, 566 F.2d at 260. "[S]egregability" is thus the "law of the land." *Schiller*, 964 F.2d at 1209. Importantly, this "segregability

requirement applies to *all* documents and *all* exemptions in the FOIA," including the work-product privilege. *Ctr. for Auto Safety v. EPA*, 731 F.2d 16, 21 (D.C. Cir. 1984) (emphases added); *accord Schiller*, 964 F.2d at 1209.

Illustrating that principle, this Court in *Deloitte* first rejected arguments that a memorandum was categorically unprotected by work-product doctrine, but then held that the record did not support a conclusion that it was "purely" work product either. 610 F.3d at 138-39. Instead, this Court observed that the document may well include *both* work product *and* "other information that is not work product." *Id.* at 139. That the memo "contain[ed] thoughts and analyses by legal counsel" did not "rule out or even render unlikely the possibility that it also include[d] other facts, other thoughts, other analyses by non-attorneys which may not be so intertwined with the legal analysis as to warrant protection under the work-product doctrine." *Id.* Accordingly, the Court remanded "for the purpose of independently assessing whether the document was entirely work product, or whether a partial or redacted version of the document could have been disclosed." *Id.*

2.    Under those principles, the nine-chapter Blue Book must at minimum be produced in redacted form, because there is no dispute that—whatever else it may include—it represents DOJ's restatement of its legal obligations to provide discovery in criminal cases. As the District Court found, the Book discusses "the legal sources of [prosecutors'] discovery obligations"; provides "background

information and instruction on discovery practices"; and conveys "agency policies regarding the government's discovery obligations."  JA 115, 117, 119.  For the reasons explained above, that does not constitute work product.

Accordingly, even if the District Court correctly identified other portions of the Blue Book as incorporating "advice, strategy, and defenses for litigation related to the government's discovery obligations" (JA 117), and even if such content were work product, that does not mean the Book *in its entirety* can be withheld. DOJ "cannot justify withholding an entire document simply by showing that it contains some exempt material."  *Mead*, 566 F.2d at 260.  Rather, as in *Deloitte*, the court in that scenario must determine "whether a partial or redacted version of the document could have been disclosed" without invading the work-product privilege.  610 F.3d at 139.  Especially given the scope of the Blue Book—nine different chapters covering a host of different subjects, JA 93—the existence of *some* strategic components within it hardly "rule[s] out or even render[s] unlikely" that other parts or chapters are not similarly privileged.  *Id.*

**3.**    The District Court reasoned, however, that the Blue Book "contains sufficient advice and litigation strategy" to warrant work-product protection, and therefore "there is no obligation on the DOJ to segregate and release any working law the Blue Book contains."  JA 119, 122.  Depending on exactly what the District Court meant by that, the court erred in one of two possible ways.

*First*, to the extent that the District Court construed this Court's caselaw as holding that a document may be withheld in its entirety so long as it contains *any* information protected by the work-product doctrine, that is plainly mistaken as a matter of law.  *See Deloitte*, 610 F.3d at 139; *Schiller*, 964 F.2d at 1209.

To be sure, documents that are *purely* work product may be withheld in full. *See Judicial Watch*, 432 F.3d at 371.  And for those purposes, "factual material" in a document that is "fully protected as work product" need not be segregated, *id.* at 371, given the basic rule that work-product doctrine "does not distinguish between factual and deliberative material," *Martin v. Office of Special Counsel,* 819 F.2d 1181, 1187 (D.C. Cir. 1987), because "even the factual material segregated from attorney work-product is likely to reveal some of the attorney's tactical and strategic thoughts," *Mervin v. FTC*, 591 F.2d 821, 825-26 (D.C. Cir. 1978).  Thus, the emails in *Judicial Watch* were exempt in full because they were *not* "only partially work product"; to the contrary, each, "in its entirety, is work product." 432 F.3d at 370.  "There are no non-work product parts of the emails.  In other words, there are no segregable parts."  *Id.*; *accord Tax Analysts v. IRS*, 117 F.3d 607, 620 (D.C. Cir. 1997) ("The work product doctrine protects such deliberative materials but it also protects factual materials prepared in anticipation of litigation.").

35

Here, by contrast, the point is not that DOJ should excise and disclose the factual portions of a document that is otherwise protected "in its entirety" as work product. *Judicial Watch* and *Tax Analysts*, which the District Court cited, are therefore inapposite. Rather, NACDL's position is that even if *parts* of the Blue Book were created "in anticipation of litigation," *i.e.*, to advise prosecutors on how to defeat discovery claims, then at least the *other parts* should be disclosed.

*Second*, to the extent that the District Court meant to say that, like the emails in *Judicial Watch*, the Blue Book is work product "in its entirety," 432 F.3d at 370, such characterization cannot be squared with the undisputed facts about the Blue Book's creation, contents, and functions. It is one thing to analyze an email or a memo as a unitary document either prepared "in anticipation of litigation" or not. But the Blue Book is a lengthy manual, with different chapters on different topics written by different authors. JA 93. If some portions represent advice to DOJ lawyers within the adversary framework while others represent efforts to neutrally flesh out the meaning of DOJ's discovery duties, those distinct portions should be treated separately—not conflated—in analyzing the work-product question.

Indeed, whatever the District Court's precise reasoning for its ruling that no segregation was required, its rule authorizes agencies to effectively evade FOIA's important mandates of transparency. If inclusion of "sufficient" strategic material or litigation advice (JA 119) in an agency record suffices to immunize *the entire*

*document* from disclosure, that creates an obvious and easy route for agencies to shield any records that FOIA would compel them to disclose yet that they would prefer to keep private.  Such a rule would severely undermine FOIA's protections and is surely not the law.  Thus, at minimum, this Court should remand the matter to the District Court for a proper segregability determination.

## II.    FOR TWO INDEPENDENT REASONS, EXEMPTION 7(E) IS ALSO INAPPLICABLE TO THE BLUE BOOK.

In the District Court, DOJ claimed that the Blue Book is also protected by FOIA's Exemption 7(E) as "law enforcement" information whose disclosure risks "circumvention of the law."  (Dkt. 13.)  Indeed, DOJ contended that disclosing the Blue Book would reveal "the identity of undercover officers," subject confidential informants to "intimidation and retaliation," and even endanger our "national security."  JA 97-98.

Exemption 7(E) provides no refuge for DOJ.  The Blue Book was created not "for law enforcement purposes," 5 U.S.C. § 552(b)(7), but rather to instruct prosecutors regarding DOJ's policies about their discovery obligations.  Further, there is no conceivable reason why disclosing the Blue Book's *summary* of the law "could reasonably be expected to risk *circumvention* of the law."  *Id.* (emphasis added).  Indeed, DOJ has provided no logical explanation why making the Blue Book available could remotely lead to the parade of horribles that it invokes.  This

Court should not read Exemption 7(E) to permit DOJ to keep secret *any* part of the Blue Book, let alone the entire thing.[1]

### A. Exemption 7(E) Is Inapplicable Because The Blue Book Was Not Created For Law Enforcement Purposes.

Exemption 7(E) applies exclusively to "records or information compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7). In other words, it exempts from disclosure only materials created for the "purposes" of "enforcing the law." *Pub. Employees for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico* ("*PEER*"), 740 F.3d 195, 203 (D.C. Cir. 2014). The Blue Book, however, was not created to help prevent, investigate, or punish unlawful conduct—but rather to instruct prosecutors about their discovery obligations. Exemption 7(E) is therefore inapplicable at the threshold.

**1.** Because Exemption 7(E) is directed toward materials compiled for law enforcement "purposes," the purpose of the document is "the critical factor" governing the exemption's applicability, and "careful" examination of that purpose is therefore necessary. *Rural Hous. Alliance v. U.S. Dep't of Agric.*, 498 F.2d 73,

---

[1] The District Court did not consider whether the Blue Book falls within the ambit of Exemption 7(E). This Court should nonetheless decide the question—which DOJ will very likely raise as an alternative ground for affirmance—because "[t]he District Court record is complete, the case was resolved below on cross-motions for summary judgment, and the parties have briefed the merits in this court." *Etelson v. Office of Pers. Mgmt.*, 684 F.2d 918, 926 (D.C. Cir. 1982). In these circumstances, a "remand would serve no purpose," particularly because any subsequent appeal would again require a "fresh look" by this Court. *Id.*

81-83 (D.C. Cir. 1974).  As this Court has explained, information is compiled for the "purposes" of enforcing the law when it is gathered specifically to prevent, investigate, or punish unlawful conduct.  *See PEER*, 740 F.3d at 203.  Accordingly, materials are compiled for law enforcement purposes and qualify for the 7(E) exemption when they "focus directly on specific alleged illegal acts which could result in civil or criminal sanctions."  *Jefferson v. U.S. Dep't of Justice, Office of Prof. Responsibility*, 284 F.3d 172, 177 (D.C. Cir. 2002).

But materials are not created *for* law enforcement *purposes* just because they are created *by* law enforcement *agencies*.  *See id.* at 177; *Rural Hous. Alliance*, 498 F.2d at 81-82.  Nor are they created "for" law enforcement "purposes" whenever they *relate to* or *govern the conduct of* law enforcement agents.  Thus, *Jefferson* held that DOJ "files in connection with government oversight of the performance of duties by its employees" did not fall within the exemption, because when DOJ compiles those files, it is "merely engaging in a general monitoring of private individuals' activities," not investigating "specific alleged illegal acts which could result in civil or criminal sanctions."  284 F.3d at 176-77.  Employee-management materials do not fall within the exemption, even if the employees happen to be involved in law enforcement.  *Id.*; *accord Rural Hous.*, 498 F.2d at 81-82 (denying protection to "agency's internal monitoring to insure that its employees are acting in accordance with statutory mandate and the agency's own regulations").

If it were otherwise—*i.e.*, if *all* materials created by or for law enforcement agencies qualified under Exemption 7(E)—"then the exemption swallows up the Act." *Id.* Any document setting out the policies of a law enforcement agency, and any "internal auditing or monitoring" of such agency, could be withheld. *Id.* Indeed, *any* document created by DOJ would be presumptively secret. This reading would "defeat[] one central purpose of the Act": "to provide public access to information concerning the Government's own activities." *Id.*

    **2.** The Blue Book was not created for "law enforcement purposes." It was not created in order to deter, investigate, or punish unlawful conduct. *See PEER*, 740 F.3d at 203. Rather, as even the District Court found, "the overarching purpose … of the book was to prevent discovery violations and litigation arising from discovery transactions." JA 119 (emphasis added). In other words, the Blue Book was created to regulate prosecutors' litigation conduct—to ensure that DOJ employees' conduct in discovery is "in accordance with statutory mandate and the agency's own regulations." *Rural Hous.*, 498 F.2d at 81. DOJ thus compiled the Blue Book as part of its "oversight of the performance of duties of its employees," in its function as manager of individuals who happen to be involved in the business of law enforcement, but not "within its principal function of law enforcement." *Jefferson*, 284 F.3d at 177. Therefore, although the purpose for which the Book was created undoubtedly *relates* to law enforcement *proceedings*—because it was

written to regulate prosecutors' conduct during such proceedings—it was not created *for* law enforcement *purposes* as FOIA uses that term.

In short, there is an insufficient nexus between the Blue Book's purposes and the fundamental purposes of "law enforcement." If the Blue Book qualifies as Exemption 7(E) material simply because it governs the conduct of agency officials in the context of criminal litigation, there is literally no DOJ document or file that could not be withheld on the same attenuated theory. That is not the law.

### B.   Exemption 7(E) Is Also Inapplicable Because Producing The Blue Book Could Not Conceivably Risk Circumvention Of The Law.

Exemption 7(E)'s reach is further limited to documents whose production "could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). DOJ may withhold the Blue Book under this exemption, therefore, only if it "demonstrates logically how the release of … information might create a risk of circumvention of the law." *PHE, Inc. v. U.S. Dep't of Justice*, 983 F.2d 248, 251 (D.C. Cir. 1993). It cannot. At most, a criminal defendant may be able to use information in the Blue Book to force DOJ to *comply* with the law. But the Book's disclosure could not by any stretch allow anyone to *circumvent* the law.

**1.** To justify an exemption under 7(E), DOJ must "at least provide *some* explanation" why release of the material at issue would risk circumvention of law. *Citizens for Responsibility and Ethics in Wash. v. U.S. Dep't of Justice*, 746 F.3d 1082, 1102 (D.C. Cir. 2014). And the explanation must be concrete and precise,

not "vague and conclusory." *PHE*, 983 F.2d at 252. For example, in *PHE* the FBI explained that the withheld material "detailed specific documents, records and sources of information" that FBI agents might inspect, "as well as the types of patterns" they would look for, while investigating certain crimes. *Id.* at 251. This information, the FBI specified, could alert potential criminals to the FBI's methods of investigation and thereby allow them to evade detection. *See id.* Because of the "specificity of the [FBI's] affidavit" and because it "demonstrate[d] logically how the release of [the material] might create a risk of circumvention of the law," this Court upheld the invocation of Exemption 7(E). *See id.*; *see also Soghoian v. U.S. Dep't of Justice*, 885 F. Supp. 2d 62, 75 (D.D.C. 2012) (finding Exemption 7(E) satisfied where agency explained that disclosing "investigative techniques" used by investigators and prosecutors in "conducting their criminal investigations" could "provide criminals the information necessary to evade or thwart detection").

DOJ in its affidavits below did not articulate any plausible reason why disclosing the Blue Book would have any such effect. The Blue Book has nothing to do with crime *detection*. So there is no risk that its disclosure would educate criminals about government investigations and teach them to avoid being caught. Rather, the Blue Book relates to DOJ's policies on *discovery* and, specifically, how the government complies with its constitutional, statutory, and ethical disclosure obligations. There is simply no logical reason why telling a criminal defendant

and his counsel "how (and when)" DOJ is likely to disclose certain types of information, JA 96—information that the defense is legally entitled to discover—would in any way allow that defendant to "circumvent" the law.

DOJ's principal argument is that handing over the Blue Book will disclose various legal arguments and theories it could employ in discovery disputes. JA 96-97, 107. This information, DOJ says, could help defendants "defeat" DOJ *in such disputes*. (Dkt. 13-1 at 24.) That is, if the Blue Book were disclosed, DOJ worries that defendants might be "more likely to prevail" in court and thereby "obtain discovery beyond that which they are entitled," or obtain it "earlier than appropriate," or "in unredacted format." JA 97, 107. The flaw in that theory is that, to the extent that the defense uses material from the Blue Book to persuade a court that DOJ must disclose certain information, or do so earlier, or in unredacted form, *the court* has made an independent determination that the defendant is *legally entitled* to that disclosure—which means there has been no "circumvention" of the law, only its *enforcement*.

That is why this Court in *PHE* rejected the argument that legal analysis like that in the Blue Book could risk circumvention of law, refusing to exempt a DOJ manual containing a "discussion of search and seizure law and [a] digest of useful case law." 983 F.2d at 251. Presumably that discussion and digest would help criminal defendants win suppression motions, which might prevent conviction and,

in turn, allow them to "escape punishment," JA 97. But that is not circumvention of law; to the contrary, this Court declared that such material was "precisely the type of information appropriate for release under the FOIA." *PHE*, 983 F.2d at 251-52; *see also Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1194 n.1 (D.C. Cir. 2009) ("garden-variety legal analysis … does not fall under Exemption 7(E)"). Here, too, if a criminal defendant is able to use legal principles or arguments from the Blue Book to convince a court that a prosecutor is not abiding by his discovery obligations, that is *enforcement* of the law—not its improper *circumvention*.

Separately, DOJ contends in conclusory terms that disclosing the Blue Book could allow defendants to destroy evidence or intimidate witnesses. JA 89, 97-98. Those acts (unlike winning discovery motions in court) would surely circumvent the law. But DOJ never explains with any clarity or specificity why releasing the Blue Book could conceivably increase the risk of such acts. Nor is there any intuitive reason why it would. Disclosure of the Blue Book would not somehow "disclos[e] the identity of undercover officers and confidential informants," JA 97, unless the Blue Book itself includes the *names* of such individuals, which is utterly implausible. Similarly, disclosure of the Blue Book could not increase the risk that "evidence might be destroyed by criminals," JA 98, assuming the Book does not include the combination code for DOJ evidence storage lockers or the like. DOJ's parade of horribles simply bears no relationship to the issue at hand.

44

In sum, DOJ has wholly failed to provide any specific or even coherent explanation of how disclosure of the Blue Book would allow circumvention of the law.  The Book is therefore not shielded by Exemption 7(E) and must be released.  *See Citizens for Responsibility*, 746 F.3d at 1102; *PHE*, 983 F.2d at 252.

**2.**    DOJ argued below that it need not establish that disclosure of the Blue Book would risk circumvention of the law.  According to DOJ, that requirement applies only to law enforcement "guidelines," whereas the Blue Book contains law enforcement "techniques" or "procedures."  DOJ is incorrect twice over.

*First*, as this Court has recognized, its decisions have consistently applied the risk-of-circumvention requirement "both to records containing guidelines and to records containing techniques and procedures."  *PEER*, 740 F.3d at 204 n.4.  Indeed, just a few years ago in *Blackwell v. Federal Bureau of Investigation*, after finding certain FBI procedures were "undoubtedly 'techniques' or 'procedures' used for 'law enforcement purposes,'" this Court held that those materials also "*needed*" to satisfy the risk-of-circumvention requirement to merit protection under Exemption 7(E).  646 F.3d 37, 42 (D.C. Cir. 2011) (emphasis added).

*Second*, in any event, the Blue Book comprises guidelines, not techniques or procedures.  The term "guidelines" means "an indication or outline of future policy or conduct."  *Allard K. Lowenstein Int'l Human Rights Project v. Dep't of Homeland Sec.*, 626 F.3d 678, 682 (2d Cir. 2010) (quoting *Webster's Third New*

*International Dictionary* (1986)).  That is precisely what the Blue Book contains.

DOJ's discovery policies are meant to outline—and *guide*—prosecutors' future

conduct.  Indeed, DOJ itself repeatedly called the Blue Book, in its declarations

below, "guidelines."  JA 79-99 (referring to Blue Book as "guidelines" 13 times in

two declarations); JA 90 (Gerson declaration) ("[T]he Blue Book consists entirely

of *guidelines* for federal prosecutors to follow in conducting the discovery phase of

law enforcement prosecutions. … The Blue Book offers comprehensive *guidelines*

for this phase of criminal federal prosecutions ….") (emphases added).

The Blue Book does not contain "techniques and procedures," which refers

to "how law enforcement officials go about investigating a crime."  *Lowenstein*,

626 F.3d at 682.  Indeed, if "techniques" and "procedures" may be withheld, as

DOJ contends, even without a showing that disclosure risks circumvention of the

law, then courts must guard against overly expansive constructions of those terms,

which would swallow FOIA's rule of transparency.  Here, no part of the Blue

Book describes any particular method for how prosecutors investigate crimes or

perform any other law enforcement function.  Even litigation advice, like a general

policy about disclosure duties, is neither "a technical method of accomplishing a

desired aim" nor "a particular way of doing or of going about the accomplishment

of something."  *Webster's Third New Int'l Dictionary* (defining these terms).

**3.**     Even if the Blue Book contained law enforcement techniques and procedures, and even if its disclosure could theoretically risk circumvention of law, Exemption 7(E) would still be inapplicable.  Techniques and procedures may not be withheld under Exemption 7(E) if they are generally known to the public.  *See, e.g.*, *Rugiero v. U.S. Dep't of Justice*, 257 F.3d 534, 551 (6th Cir. 2001); *Doherty v. U.S. Dep't of Justice*, 775 F.2d 49, 52 (2d Cir. 1985); *Williams v. U.S. Dep't of Justice, Drug Enforcement Admin.*, No. 85-6154, 1988 WL 76590 (D.C. Cir. May 18, 1988).  That makes sense: After information is disclosed once, disclosing it again does not pose additional security threats.  Here, the types of material supposedly covered in the Blue Book have been disclosed elsewhere by DOJ.

Indeed, DOJ has argued that the Blue Book must be protected because it contains information about "protect[ing] witnesses from retaliation and intimidation."  JA 96.  But the already-public United States Attorneys' Manual ("USAM," http://www.justice.gov/usam/united-states-attorneys-manual) and the Federal Criminal Discovery issue of the United States Attorneys' Bulletin ("CDB," http://www.justice.gov/sites/default/files/usao/legacy/2012/09/24/usab6005.pdf) already contain the same kind of information.  *See, e.g.*, USAM § 9-6.200 (section entitled "Pretrial Disclosure of Witness Identity"; discussing when and whether prosecutors should share contact information for victims and witnesses); CDB at 49-59 (discussing need and methods to protect "privacy, dignity, and of course,

safety of victims and witnesses"). DOJ has also contended that the Blue Book should be kept secret because it conveys tips regarding the timing and scope of disclosures. JA 96 (Book describes "how (and when) to disclose documents"). Yet the USAM and CDB provide tips on the identical topics. *See, e.g.*, USAM Crim. Resource Manual 165 (section entitled "Considerations Regarding the Scope and Timing of the Disclosures"); CDB at 13-19, 27-31 (discussing *Brady*'s materiality standard and scope of discovery obligations under Fed. R. Evidence 806). And DOJ claims that disclosing the Blue Book will reveal material about "protective orders relating to potentially discoverable information." JA 96. But, again, the USAM and CDB have already publicized the same kind of material. *See, e.g.*, USAM Crim. Resource Manual 2054 (conveying advice on when and how to obtain protective order for classified information); CDB at 54-56 (discussing when to seek protective order). Because DOJ has already published various similar "techniques" or "procedures" on criminal discovery, Exemption 7(E) cannot shield the Blue Book.

### C.    If Any Part Of The Blue Book Is Subject To Exemption 7(E), At Minimum The Remainder Must Be Segregated And Produced.

FOIA's segregability requirement mandates disclosure of all non-exempt, reasonably segregable material, including in the Exemption 7(E) context. *See PHE, Inc.*, 983 F.2d at 252; *see supra*, Part I.C. Thus even if this Court concludes

that DOJ has provided logical reasons why particular parts of the Blue Book cannot safely be released, it should order disclosure of the remaining parts.

At a minimum, the Court should order DOJ to make available its policies on and interpretation of its disclosure obligations.  This is working law, and it is "precisely the type of information appropriate for release under the FOIA."  *PHE, Inc.*, 983 F.2d at 251-52.  As this Court explained, working law should virtually never be withheld, irrespective of whether it appears together with exempt material: "Even when the law is closely intermingled with other data, we cannot conceive of a situation in which legal interpretations and guidelines could not be segregated from other material and isolated in a form which could be disclosed." *Cuneo v. Schlesinger*, 484 F.2d 1086, 1092 (D.C. Cir. 1973); *see also id.* ("It is particularly important that information which is in effect substantive law not be concealed beneath a mass of other material.").  Because there is no "conceiv[able]" reason that discussion of DOJ's discovery policies and obligations cannot be segregated from any exempt portions of the Blue Book, the Court should order their release.

## **CONCLUSION**

For the reasons above, this Court should reverse the judgment below and order Defendants-Appellees to make available all (or, at the very least, portions of) the Federal Criminal Discovery Blue Book.

July 15, 2015                    /s/ Kerri L. Ruttenberg
                                 KERRI L. RUTTENBERG
                                   *Lead Counsel*
                                 YAAKOV M. ROTH
                                 JULIA FONG SHEKETOFF*
                                 JONES DAY
                                 51 Louisiana Ave. N.W.
                                 Washington, DC  20001
                                 (202) 879-3939
                                 kruttenberg@jonesday.com
                                 yroth@jonesday.com
                                 jsheketoff@jonesday.com

                                 *Counsel for Appellant*

                                 *Admitted in New York
                                 Supervised by member of D.C. bar

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,833 words, excluding the parts of the brief exempted by that Rule and D.C. Cir. R. 32(a)(1), as counted using the word-count function on Microsoft Word 2007 software.


July 15, 2015                                    /s/ Julia Fong Sheketoff

                                                 JULIA FONG SHEKETOFF
                                                 JONES DAY
                                                 51 Louisiana Ave. N.W.
                                                 Washington, DC  20001
                                                 (202) 879-3939
                                                 jsheketoff@jonesday.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 15th day of July 2015, I electronically filed the original of the foregoing document with the clerk of this Court by using the CM/ECF system.  I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. Pursuant to this Court's Local Rules, I also caused eight copies of the foregoing document to be filed, by hand delivery, with the clerk of this Court.

July 15, 2015

/s/ Julia Fong Sheketoff

JULIA FONG SHEKETOFF
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC  20001
(202) 879-3939
jsheketoff@jonesday.com

**STATUTORY ADDENDUM**

## 5 U.S.C. § 552

**(a)** Each agency shall make available to the public information as follows:

**(1)** Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—

…

**(D)** substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency;

…

**(2)** Each agency, in accordance with published rules, shall make available for public inspection and copying—

…

**(B)** those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register;

…

**(3)(A)** Except with respect to the records made available under paragraphs (1) and (2) of this subsection, and except as provided in subparagraph (E), each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person.

…

**(b)** This section does not apply to matters that are—

…

**(5)** inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

…

**(7)** records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information

…

**(E)** would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law

…

Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection. The amount of information deleted, and the exemption under which the deletion is made, shall be indicated on the released portion of the record, unless including that indication would harm an interest protected by the exemption in this subsection under which the deletion is made. If technically feasible, the amount of the information deleted, and the exemption under which the deletion is made, shall be indicated at the place in the record where such deletion is made.